ORDERED.

Dated: September 5, 2012

Eileen W. Hollowell, Bankruptcy Judge
_____



UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: ) | Chapter 13 |
| ) | |
| MARK BOND and ) | Case No. 4:11-bk-33849-EWH |
| ASHLEA BOND, ) | |
| ) | **MEMORANDUM DECISION** |
| Debtors ) | |
| _____ ) | |

## I. INTRODUCTION

Mark and Ashlea Bond ("Debtors") filed a Chapter 13 petition which listed among their assets partnership interests in two limited liability companies. The respective values which Debtors assigned to these interests were challenged, and for the reasons explained below, Debtors must amend their Schedules and Chapter 13 plan in accordance with this decision.

## II. FACTUAL AND PROCEDURAL HISTORY

Debtors filed a Chapter 13 voluntary petition on December 13, 2011. Debtors have filed as joint individuals and list the nature of their debts as primarily consumer. In addition, Debtors' petition includes several business aliases under which Debtors have operated various retail concerns. These names are "ITP Enterprizes LLC d/b/a Green Valley Furnishings"; ITP Enterprizes LLC "FDBA Teed Off Golf"; and "AMG Enterprizes

LLC d/b/a/ Old Chicago Deli." According to their Statement of Financial Affairs, Debtors own a 70% partnership interest in both ITP Enterprizes LLC ("ITP") and AMG Enterprizes LLC ("AMG"). Schedule B states that the interest in ITP is worth $3,000 and that the interest in AMG is worth $5,000. Schedule I reflects that Debtors earn $3,300 in monthly income from their ongoing partnerships in Green Valley Furnishings ("Green Valley") and Old Chicago Deli ("Old Chicago").

On their Schedule F, Debtors list Prince Road Associated LLC ("PRA"),[1] a landlord, as an unsecured nonpriority creditor with a claim for an unspecified amount. In 2008, PRA entered into a lease with Debtors and Green Valley[2] ("the Lease") for a retail business location. The Lease identified the lessees as Debtors and Green Valley, but Debtors have scheduled the claim as a debt arising from a lease that ITP entered into for the purpose of doing business as Teed Off Golf. Despite this difference, there is no dispute that Debtors, with Green Valley, entered into the Lease with PRA.

Debtors' Chapter 13 plan ("the Plan"), also filed on December 13, 2011, proposes to reject the Lease and claims that the Lease has been terminated. The Plan calls for Debtors to make payments of $200 a month for thirty six months, and it provides that over the plan term Debtors will satisfy a $1,000 priority unsecured tax claim in full while paying unsecured creditors $2,499.

PRA filed an objection to the Plan on January 30, 2012. In its objection, PRA alleged that Debtors, while operating Green Valley, defaulted on the Lease in October

---

[1] Debtors scheduled the creditor as "Prince Road Associates LLC." However, the creditor has referred to itself as "Prince Road Associated" even though it leased commercial real property to Debtors under the name "Prince Road Associates LLC." There is no actual dispute about the identity of the party appearing as PRA, and this difference is immaterial to the Court's ruling.

[2] Despite Debtors' bankruptcy petition listing ITP's full name as "ITP Enterprizes LLC," the Lease refers to ITP as "ITP Enterprises LLC." As is the case with regard to PRA, there is no actual dispute about the identity of ITP or Green Valley.

2

2010 and moved Green Valley to a new location without satisfying the remaining balance on the Lease. PRA initiated a lawsuit in state court to recover what it alleges was the remaining balance, $75,551.16, but Debtors' bankruptcy case stayed that action. PRA contended that the Plan's treatment of its claim was not fair or reasonable[3] in light of Debtors' intention to continue operating Green Valley and Old Chicago, along with Debtors retaining their partnership interests in those businesses. Further, PRA asserted that Debtors failed to disclose a painting business that generates income for them and had not provided a full accounting of their assets, their tax returns, or the respective inventories of ITP and AMG.[4]

Debtors responded to PRA's objection on March 12, 2012. Debtors did not dispute that a default on the Lease had occurred, nor did they challenge the amount PRA seeks to recover. However, Debtors noted that PRA's claim was being treated in the same fashion as all other unsecured claims, which Debtors admitted would result in no distribution to PRA.[5] Debtors also disclosed that while they were 70% owners of Green Valley at the time they filed their bankruptcy petition, Green Valley was sold postpetition to a non-insider purchaser for $3,500. Debtors claim that their partnership interest in Old Chicago is now their sole source of income.

---

[3] The Bankruptcy Code does not require that a Chapter 13 plan be "fair and reasonable," but it does require that a plan be proposed in "good faith." See 11 U.S.C. 1325(a)(3).

[4] If PRA's allegations are correct, Debtors could not satisfy the requirement of 11 U.S.C. 1325(a)(4) that property of the estate distributed through a Chapter 13 plan equal the amount unsecured creditors would receive through a Chapter 7 liquidation.

[5] Debtors did not explain how PRA would be treated like all other unsecured creditors but nonetheless receive no distribution given that Debtors' Plan calls for unsecured creditors to receive a pro-rata share of the $2,499 allocated for unsecured claims.

3

On July 11, 2012, the Court held an evidentiary hearing to address the value of Debtors' partnership interests and the Plan.[6] PRA argued that Debtors had undervalued Green Valley and Old Chicago. According to PRA, just before the hearing Debtors provided tax records to PRA which showed that Green Valley had gross receipts of $185,000 and gross profits of $108,000 in 2009; gross receipts of $146,000 and gross profits of $68,000 in 2010; and gross receipts of $217,000 and gross profits of $139,000 in 2011. PRA argued that it had similar reason to believe that Debtors had sold their interest in Old Chicago for $200,000 in 2008 before reacquiring it, and that Old Chicago had gross receipts of $380,000 and gross profits of $108,000 in 2011. As a result, PRA challenged the accuracy of the scheduled values for Green Valley and Old Chicago that Debtors listed on their Schedule B.

Mark Bond ("Bond") testified at the hearing that Green Valley had been sold for $3,500, a price which included a truck owned by the business valued at $3,000. Bond explained that Green Valley was a consignment-furniture operation, and it had owned little or no inventory outright. In any event, on the date of the hearing,[7] Debtors no longer maintained an interest in that business.

Bond also said that he had received approximately $70,000 from the sale of Old Chicago in 2008 but took back the business after the purchaser could not make required payments for the full $200,000 purchase price. When questioned about how he

---

[6] The Court acknowledges that in addition to disputing certain financial information provided by Debtors, the PRA objection to the Plan also took issue with how the Plan treats PRA's claim. This opinion does not address PRA's Plan treatment, and PRA retains all rights to pursue that issue if Debtors file an amended plan.

[7] For purposes of plan confirmation, assets are valued as of the effective date of the plan, and that date cannot be earlier than the original date of plan confirmation. In re Gibson, 415 B.R. 735 (Bankr. Ariz. 2009).

4

valued his partnership interests in Green Valley and Old Chicago, Bond explained that Green Valley's assets were limited to a truck and some used furniture, while AMG's assets included food inventory, several older pieces of restaurant equipment, and dining-room furniture. He assigned his own liquidation values to these items and consulted a restaurant equipment vendor for an informal appraisal of Old Chicago's assets. Bond testified that he did not consult a business broker. Bond valued Old Chicago at $5,000.

The Court questioned Bond about his present circumstances. Bond calculated that on a monthly basis, Old Chicago pays roughly $1,900 in rent, maintains payroll expenses of $7,600, incurs approximately $3,000 in food costs, and has utility bills in excess of $1,500. Bond testified that his current monthly income from Old Chicago is roughly $3,000 per month, and that after accounting for all these outlays, Old Chicago loses money. However, he also explained that Old Chicago is generally profitable from October through April, and sometimes Debtors earn up to $5,000 per month in income from its operation. Asked to clarify, Bond summarized that Old Chicago earns between $20,000 and $25,000 in profit per year, earnings which Debtors distribute to themselves.

At the close of testimony, the Court concluded that the Green Valley sale was conducted in good faith, and that Green Valley was not undervalued. However, the Court found that Debtors' interest in Old Chicago had been. It instructed Debtors that relying on Old Chicago's liquidation value, instead of treating it as an ongoing business, was inappropriate. Additionally, the Court asked that Debtors submit pertinent business records for the Court to review in determining the value of Old Chicago.

5

On July 18, Debtors filed partnership income statements for Old Chicago from 2010 and 2011 along with Old Chicago's Profit & Loss statements from July 2010 through June 2012.

### III. ISSUE

1) What is the going-concern value of Old Chicago?

2) Should Debtors be required to amend their calculation of disposable income to include the profits realized from the operation of Old Chicago?

3) If so, how should that amount be determined?

### IV. JURISDICTIONAL STATEMENT

Jurisdiction is proper under 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (L).

### V. DISCUSSION

Going-Concern Value

Determining the going-concern value of a business for the purpose of calculating a Chapter 13 debtor's ownership interest is not a common topic for bankruptcy courts. In the Ninth Circuit, most Chapter 13 cases that have addressed going-concern value have focused on how to calculate the value of collateral securing a claim. See, e.g., Ardmor Vending Co. v. Kim (In re Kim), 130 F.3d 863 (9th Cir. 1997); Taffi v. United States (In re Taffi), 68 F.3d 306 (9th Cir. 1995). Cases on point are similarly scarce in other circuits; they, too, have focused inquiries into going-concern value on how to properly value secured claims. See, e.g., GMAC v. Valenti (In re Valenti), 105 F.3d 55 (2nd Cir. 1997); Winthrop Old Farm Nurseries v. New Bedford Inst. for Sav. (In re Winthrop Old Farm Nurseries), 50 F.3d 72 (1st Cir. 1995); Associates Commer. Corp. v. Rash (In re Rash), 31 F.3d 325 (5th Cir. 1994); see also Keith M. Lundin & William H.

Brown, CHAPTER 13 BANKRUPTCY, 4th Edition, § 108.1, at ¶ 21, Sec. Rev. Apr. 14, 2009. Despite this absence of direct authority, Taffi and Kim contain reasoning which the Court can apply to this case.

In Taffi, the IRS sought to enforce a tax lien on a home that the debtors were going to retain through their plan of reorganization. The Ninth Circuit had to consider which method was appropriate for determining the value of collateral retained by a debtor for debtor's own use. The Ninth Circuit held that when a Chapter 13 debtor "intends to retain property subject to a lien" and "the proposed use of the property is continued retention by the debtor, the purpose of the valuation is to determine how much the creditor will receive for the debtor's continued possession." Taffi v. United States, 96 F.3d at 1192.

The Ninth Circuit panel in Kim expanded upon this rationale. Addressing a Chapter 13 plan which treated one secured claimant as only partially secured and another as wholly unsecured, the Ninth Circuit instructed, "In light of Taffi," where the debtors "continu[e] to operate the business…valuation should [be] based on the…use or disposition to be made of the interest, which in this case means the continued operation of the business in the same location." In re Kim, 130 F.3d at 865. The Kim decision rejected the debtors' attempt to value two pieces of business equipment calculated as if the property were going to be liquidated because the equipment was not going to be sold but, instead, used to sustain an ongoing business. Id.

In the present case, Debtors do not seek to determine the value of a secured claim. However, Debtors have proposed a liquidation value for their interest in Old Chicago which ignores that the business is a going concern and that Debtors will

7

operate it. As Taffi and Kim concluded, this sort of circumstance requires that Debtors calculate a value which reflects what creditors may receive from Debtors' continued possession and operation. That valuation should be calculated on a going-concern basis.

There are various methods which can be used to calculate the value of a business. The Ninth Circuit has not articulated one preferred standard. The method preferred in the Second and Seventh Circuits is discounted cash flow ("DCF"). "Many authorities recognize that the most reliable method for determining the value of a business is the discounted cash flow…method." Lippe v. Bairnco Corp., 288 B.R. 678, 689 (S.D.N.Y. 2003) (citing Frymire-Brinati v. KPMG Peat Marwick, 2 F.3d 183, 186 (7th Cir. 1993) (DCF is "the methodology that experts in valuation find essential"); Shannon P. Pratt et al., VALUING A BUSINESS: THE ANALYSIS & APPRAISAL OF CLOSELY HELD COMPANIES 154 (4th ed. 2000) ("Regardless of what valuation approach is used, in order for it to make rational economic sense from a financial point of view, the results should be compatible with what would result if a well-supported discounted economic income analysis were carried out."))

At the Court's request, Debtors filed several recent income and profit and loss statements for Old Chicago. To the extent that the Court left the impression that it would use that information to calculate a going-concern value for Old Chicago, the Court was in error. The Court is not qualified to conduct such an analysis. That is a task for Debtors, as owners of the interest in Old Chicago, or an expert they hire. The Court is aware that in Chapter 13 cases the parties have limited resources to retain experts. While Debtors must calculate a going-concern value for Old Chicago, nothing in this

8

decision prevents Debtors from using a different methodology than that suggested by the Court. Nor does this decision prevent PRA from retaining a business broker or some other expert to provide an opinion regarding the going-concern value of Old Chicago.

Chapter 13 Disposable Income

In addition to amending the value of their interest in Old Chicago, Debtors also must amend their calculation of disposable income. Under Section 1304,[8] "[a] debtor that is self-employed and incurs trade credit in the production of income from such employment is engaged in business," and such a debtor is authorized to operate that business during the pendency of a Chapter 13 case. Debtors qualify as self-employed and engaged in business.

In order to confirm a Chapter 13 plan when an unsecured creditor objects, a debtor must propose to pay all projected disposable income to unsecured creditors under the plan. 11 U.S.C. § 1325(b)(1)(B). When calculating "disposable income," a debtor engaged in business may deduct expenses "necessary for the continuation, preservation, and operation of such business." 11 U.S.C. § 1325(b)(2)(B).

In this case, Debtors have testified that despite experiencing seasonal earnings fluctuations, Old Chicago yields between $20,000 and $25,000 annually in profits which Debtors pay to themselves in addition to monthly wages of $3,000. This profit must be added in when calculating the income which Debtors apply to their plan. As a leading treatise instructs, "The net business income available after payment of all necessary business expenses is…the starting amount from which personal expenses are deducted

---

[8] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. The Federal Rules of Bankruptcy Procedure, Rules 1001-9037, are referred to as "Rules." The Federal Rules of Civil Procedure are referred to as "Civil Rules."

9

to arrive at projected disposable income." Lundin & Brown, CHAPTER 13 BANKRUPTCY, 4th Edition, § 167.1, at ¶ 3, Sec. Rev. Apr. 14, 2009.

**VI. CONCLUSION**

Debtors' Schedules and Plan undervalue their ownership interest in Old Chicago as a going concern and violate § 1325 by failing to adequately account for all disposable income. As a result, the Court will enter a separate Order on this date requiring that Debtors calculate the going-concern value of their 70% interest in Old Chicago[9] and amend their Schedules and Plan to reflect this calculation along with the $20,000-$25,000 in additional annual income earned from Old Chicago.

Dated and signed above.

Notice to be sent through
the Bankruptcy Noticing Center
to the following:

Ashlea Bond
Mark Bond
1311 W. Calle de la Plaza
Sahuarita, AZ 85629

H. Lee Horner, Jr.
Goldstein, Horner & Horner
P.O. Box 2665
Cortaro, AZ 85652

Karl MacOmber
Monroe McDonough Goldschmidt & Molla, PLLC
4578 N. First Ave., Ste. 160
Tucson, AZ 85718

Dianne Kerns
7320 N. La Cholla #154 PMB 413
Tucson, AZ 85741

---
[9] If PRA wishes to challenge Debtors' amended valuation, PRA may do so by filing an objection to the amended Chapter 13 plan.

10

U.S. Trustee
230 N. First Ave., Ste. 204
Phoenix, AZ 85003